## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SUSAN FOX, individually, and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CONDÉ NAST PUBLICATIONS, a Delaware Corporation, <br><br> Defendant. | Case No. 2:12-cv-14312 <br><br> **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Susan Fox ("Plaintiff" or "Fox") brings this Class Action Complaint against Defendant Condé Nast Publications ("Condé Nast") to obtain redress for all persons injured by Condé Nast's intentional and unlawful disclosure of Plaintiff's and its other subscribers' highly personal and sensitive information. For her Class Action Complaint ("Complaint"), Fox alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

### NATURE OF THE CASE

1.      Condé Nast is an international media company that publishes some of the most widely circulated magazines in the United States, including *GQ*, *The New Yorker*, *Vanity Fair*, *Vogue*, *Glamour*, *Allure*, and *Lucky*.

2.      Unfortunately for its subscribers, Condé Nast isn't content with just making money from magazine sales. Instead, Condé Nast double dips by selling its subscribers' personal information—including, *inter alia*, their full names, titles of magazines subscribed to, and home addresses (collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information such as gender, age, ethnicity, income, net worth,

1

religion, political party, and parental status—to data miners and other third parties.

3.      Condé Nast's disclosure of such personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society. In fact, anyone can buy a customer list from Condé Nast that contains a number of categories of detailed subscriber information. For example, a purchase could buy a list with the names and addresses of all *Bon Appétit* subscribers who are single, over the age of 80, with a net worth greater than $500,000, no children in the household, and a history of charitable donations. Condé Nast would sell such a list for approximately $180 per thousand subscribers listed.

4.      While Condé Nast profits handsomely from such practices, its subscribers are completely unaware that their personal information is sold on the open market. In fact, Condé Nast never receives its customers' consent prior to selling their Personal Reading Information.

5.      By selling its customers' Personal Reading Information without their consent, Condé Nast not only disregards its customers' safety and basic privacy rights, but also violates Michigan's Video Rental Privacy Act, M.C.L. § 445.1712 ("VRPA"), which prohibits companies from disclosing without permission any record or information concerning a customer's purchase of written materials if the record identifies the customer.

6.      Accordingly, Plaintiff Fox brings this Class Action Complaint against Condé Nast for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the VRPA, for breach of contract, and, in the alternative to breach of contract, for unjust enrichment.

## PARTIES

7.      Plaintiff Susan Fox is a natural person and resident of the State of Michigan.

8.     Defendant Condé Nast Publications is a Delaware corporation with its principal place of business at 4 Times Square, New York, New York, 10036. Condé Nast does business throughout Michigan and the United States.

## JURISDICTION AND VENUE

9.     This Court has personal jurisdiction over Condé Nast because it is registered to do, and regularly does, business in Michigan, including soliciting consumer business from, and entering into consumer transactions with, Michigan consumers. Further, the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated from, Michigan.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one Class member is a citizen of a different state than Defendant, the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and none of the exceptions under that subsection apply to this action.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claim occurred in this District. 28 U.S.C. § 1391(a)(2). Venue is additionally proper because Plaintiff resides within this District in Oakland County, and Defendant transacts significant business in this District, including soliciting and entering into consumer transactions.

## FACTUAL BACKGROUND

### *Michigan's Video Rental Privacy Act*

12.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive

form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

13.    Recognizing the need to protect its citizens' privacy rights, Michigan's legislature enacted the VRPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. HB No. 5331, 1988 Mich. Legis. Serv. 378.

14.    Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

15.    Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless.)

16.    Despite the fact that thousands of Michigan residents subscribe to Condé Nast publications, Condé Nast ignores its legal responsibility by systematically violating the VRPA.

### *The Personal Information Market: Consumers' Personal Information Has Real Value*

17.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our

life . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

18.     More than a decade later, Commissioner Swindle's comments ring truer than

ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per

year online advertising industry in the United States.[2]

19.     The FTC has also recognized that consumer data possesses inherent monetary

value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount
> of information collected by businesses, or why their information
> may be commercially valuable. *Data is currency. The larger the
> data set, the greater potential for analysis—and profit.*[3]

20.     It is now a nearly ubiquitous practice for companies that collect consumer

information—such as names, addresses, and product purchase histories—to profit from sharing

this data with numerous third parties, without ever disclosing such practices to or obtaining

consent from the source consumer.

21.     In fact, an entire industry exists in which companies known as data miners

purchase, trade, and otherwise collect massive databases of information about consumers. Data

miners then profit by selling this "extraordinarily intrusive" information in an open, and largely

unregulated, market.[4]

---

[1]     The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001),
http://www.ftc.gov/bcp/workshops/infomktplace/transcript.htm (last visited Sept. 19, 2012).

[2]     *See*, Web's Hot New Commodity: Privacy, WSJ.com (Feb. 27, 2011),
http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last
visited Sept. 19, 2012).

[3]     Statement of FTC Commissioner Pamela Jones Harbour,
http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Sept. 19, 2012).
(emphasis added).

[4]     *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, time.com (July

22.     The scope of data miners' knowledge about consumers is truly astounding: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

23.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[6]

24.     In their letter, the co-Chairmen recognized that:

> [t]he business of data brokerage, namely the collecting, assembling, maintaining, and selling to third-parties of consumers' personal information, has grown into a multiple billion dollar industry. *By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer*. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[7]

25.     Data mining is especially troublesome when consumer information is sold to

---

31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Sept. 19, 2012).

[5]     Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Sept. 19, 2012).

[6]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Congressman Ed Markey (July 24, 2012), http://markey.house.gov/press-release/bipartisan-group-lawmakers-query-data-brokers-about-practices-involving-consumers%E2%80%99 (last visited Sept. 19, 2012).

[7]     Letter from Edward J. Markey and Joe Barton, co-Chairmen, Congressional Bi-Partisan Privacy Caucus, to Scott E. Howe, Chief Executive Officer, Acxiom (July 25, 2012) (available at http://markey.house.gov/sites/markey.house.gov/files/documents/Axciom%20letter.pdf) (emphasis added).

direct marketing companies. In addition to causing waste and inconvenience, direct marketers often use consumer information to lure unsuspecting consumers into various scams,[8] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Condé Nast share information with data miners and direct marketers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[9]

26.     Information disclosures like Condé Nast's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[10] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[11]

27.     Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Condé Nast's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of

---

[8]     *Prize Offers: You Don't Have to Pay to Play!*, Federal Trade Commission, http://www.ftc.gov/bcp/edu/pubs/consumer/telemarketing/tel17.shtml (last visited Sept. 19, 2012).

[9]     Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007 at A1.

[10]    *Id.*

[11]    *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* http://www.ftc.gov/os/2000/08/agingtestimony.htm (last visited Sept. 19, 2012).

scam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[12]

28.     Condé Nast is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data miners, direct marketers, and third parties is a widespread practice in the publishing industry.

29.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

30.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[13]

31.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. In fact, research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[14]

32.     Thus, in today's economy, individuals and businesses alike place a real,

---

[12]     *Id.*

[13]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Sept. 19, 2012).

[14]     Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also generally* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Sept. 19, 2012).

quantifiable value on consumer data and corresponding privacy rights.[15] As such, where a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer is denied the full monetary value of that transaction.

### *Condé Nast Unlawfully Sells its Subscribers' Personal Reading Information*

33.     Condé Nast maintains a vast digital database comprised of its subscribers' Personal Reading Information. Condé Nast discloses the Personal Reading Information to data mining companies including Acxiom, E-Tech, and others, who then supplement that information with sensitive personal information about each Condé Nast subscriber, including gender, age, ethnicity, income, net worth, religion, political party, and whether a particular subscriber has children living at home. (*See*, *e.g.*, Group Exhibit 1.)

34.     Condé Nast then sells its mailing lists—which include subscribers' Personal Reading Information, and can include the sensitive information obtained from data miners—to interested third parties, allowing those companies to identify which individuals purchased which magazines. (*See*, *e.g.*, Group Exhibit 1.)

35.     As a result of Condé Nast's data compiling and sharing practices, companies can purchase mailing lists from Condé Nast that identify Condé Nast subscribers by their most intimate details: income, political affiliation, religious practice, and charitable donations. Condé Nast's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers. For example, Condé Nast will sell—to anyone willing to pay for it—a mailing list of all single *Bon Appétit* subscribers who are single, over the age of 80, with a net worth greater than $500,0000, no children in the

---

[15]     Hann *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Sept. 19, 2012) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

household, and a history of charitable donations.

36.    Unfortunately, Condé Nast does not seek its subscribers' consent prior to these excessive and intrusive information disclosures, and Condé Nast's subscribers are not notified before their information is disclosed. Thus, Condé Nast's subscribers remain unaware that their Personal Reading Information and other sensitive personal information is being bought and sold on the open market.

37.    As a result, Condé Nast disclosed and continues to disclose its customers' Personal Reading Information—including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[16]— to anybody willing to pay for it.

38.    By and through these actions, Condé Nast has intentionally disclosed to third parties its Michigan subscribers' Personal Reading Information without consent, in direct violation of the VRPA and in breach of its contracts with Plaintiff and the other members of the Class.

### FACTS RELATING TO PLAINTIFF SUSAN FOX

39.    Plaintiff Susan Fox is a citizen of the state of Michigan.

40.    Fox subscribes to *Lucky*.

41.    *Lucky* is a magazine published, owned, and operated by Condé Nast.

42.    Fox has never agreed to allow Condé Nast to sell or disclose her Personal Reading Information to anyone.

43.    Condé Nast has never given Fox prior notice of any sale or other disclosure of her

---

[16]    *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Sept. 19, 2012).

Personal Reading Information.

44.     However, beginning on the date that Fox subscribed to *Lucky*, and continuing to the present, Condé Nast has disclosed, and continues to disclose, without consent or prior notice, Fox's Personal Reading Information (*i.e.*, information that identifies Fox as a *Lucky* subscriber) to data mining companies including Acxiom, E-Tech, and others, who then supplement that information with data from their own files.

45.     Furthermore, during that same time period, Condé Nast has sold—and continues to sell and offer for sale—mailing lists containing Fox's Personal Reading Information to third parties seeking to contact Condé Nast subscribers, without first obtaining Fox's written consent or even giving her prior notice of the sales.

46.     Because Condé Nast sold and disclosed her Personal Reading Information, Fox now receives a deluge of junk mail and telephone solicitations offering, among other things, discounted magazine subscriptions. These unwanted offers waste Fox's time, money, and resources, and cause her emotional distress, including irritation, annoyance, and anxiety and fear that her personal information will fall into the hands of thieves and scammers. This increase in harassing junk mail and phone calls received by Fox is attributable to Condé Nast's sale of her Personal Reading Information.

47.     Additionally, because Fox is entitled by law to privacy in her Personal Reading Information, and because she paid money for her subscription, Condé Nast's sale of Fox's Personal Reading Information deprived Fox of the full set of benefits to which she was entitled as part of her *Lucky* subscriptions, thereby causing her economic harm.

## CLASS ACTION ALLEGATIONS

48.     **Class Definition:** Plaintiff brings this action on behalf of herself and a proposed

Class, defined as follows:

> All Michigan residents who had their Personal Reading Information disclosed to third parties by Condé Nast without consent.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendant, and (5) the legal representatives, successors, or assigns of any such excluded person.

49.     **Numerosity:** The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder of each class member is impracticable. Defendant has deceived, and profited from selling the Personal Reading Information of, thousands of consumers who fall into the definition set forth above. Ultimately, members of the Class will be easily identified through Defendant's records.

50.     **Typicality:** Plaintiff's claims are typical of the claims of the other Class members. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

51.     **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class, and she has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to

vigorously prosecuting this action on behalf of the Class members, and they have the financial

resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the other

Class members.

52.     **Commonality and Predominance:** Common questions of law and fact exist as to

all members of the Class, and they predominate over any questions affecting only individual

members. Those questions with respect to the Class include, but are not limited to:

(a)     Whether Condé Nast is "engaged in the business of selling at retail" books

or other written materials (*i.e.*, magazines);

(b)     Whether Condé Nast obtained consent before disclosing Plaintiff's and the

Class's Personal Reading Information to third parties;

(c)     Whether Condé Nast's disclosure of Plaintiff's and the Class's Personal

Reading Information violated the Video Rental Privacy Act, M.C.L.

§ 445.1712;

(d)     Whether Condé Nast's sale of Plaintiff's and the Class's Personal Reading

Information constitutes a breach of contract; and

(e)     Whether Condé Nast's sale and disclosure of Plaintiff's and the Class's

Personal Reading Information constitutes unjust enrichment.

53.     **Superiority:** Class proceedings are superior to all other available methods for the

fair and efficient adjudication of this controversy, as joinder of all Class members is

impracticable. The damages suffered by the individual Class members will likely be small

relative to the burden and expense of individual prosecution of the complex litigation

necessitated by Defendant's actions. Thus, it would be virtually impossible for the Class

members to obtain effective relief from Defendant's misconduct on an individual basis. Even if

Class members could sustain individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

54.     **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's practices challenged herein apply to and affect the Class members uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

55.     Plaintiff reserves the right to revise the definition of the Class as necessary based upon information learned in discovery.

**FIRST CAUSE OF ACTION**
**Violation of the Video Rental Privacy Act**
**(M.C.L. § 445.1712)**
**(On Behalf of Plaintiff and the Class)**

56.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

57.     As a magazine publisher that sells subscriptions to consumers, Condé Nast is engaged in the business of selling written materials at retail. M.C.L. § 445.1712.

58.     By subscribing to *Lucky*, Fox purchased written materials from Condé Nast. M.C.L. § 445.1712.

14

59.     Because Fox purchased written materials from Condé Nast, she is a "customer" within the meaning of the VRPA. M.C.L. § 445.1711(a).

60.     At all times relevant, and beginning on the date Fox initiated her *Lucky* subscription, Condé Nast disclosed—and continues to disclose—Fox's Personal Reading Information, which identifies her as a *Lucky* subscriber, in at least two ways.

61.     First, Condé Nast disclosed mailing lists containing Fox's Personal Reading Information to data mining companies including Acxiom, E-Tech, and others, who then supplemented the mailing lists with additional information from their own databases, before sending the information back to Condé Nast.

62.     Second, Condé Nast sold its mailing lists containing Fox's Personal Reading Information—enhanced with additional information from data miners—to interested third parties, who could then use the mailing lists to contact Condé Nast subscribers. Because the mailing lists included the additional information from the data miners, the lists are more valuable, and Condé Nast is able to increase its profits gained from the mailing list sales.

63.     By selling or otherwise disclosing its subscriber lists, Condé Nast disclosed to persons other than Fox records or information concerning her purchase of written materials from Condé Nast. M.C.L. § 445.1712.

64.     The information Condé Nast disclosed indicates Fox's name and address, as well as the fact that she subscribes to *Lucky*. Accordingly, the records or information disclosed by Condé Nast indicate Fox's identity. M.C.L. § 445.1712.

65.     Fox never consented to Condé Nast disclosing her Personal Reading Information to anyone.

66.     Worse still, Condé Nast did not even give Fox prior notice of its disclosure of her

Personal Reading Information to third parties.

67.     By disclosing Fox's Personal Reading Information, Condé Nast violated Fox's common law right to privacy.

68.     By disclosing Fox's Personal Reading Information, Condé Nast violated Fox's statutorily protected right to privacy in her reading habits. M.C.L. § 445.1712.

69.     Additionally, because Fox and the Class paid for their Condé Nast subscriptions, and Condé Nast was obligated to comply with the VRPA, Condé Nast's unlawful disclosure of Fox's and the other Class members' Personal Reading Information deprived Fox and Class members of the full value of their paid-for subscriptions. Because Fox and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Condé Nast's unlawful sale of their Personal Reading Information deprived them of paid-for value, thereby causing them economic harm.

70.     Also, because Fox and the other Class members priced VRPA compliance into their willingness to subscribe to Condé Nast publications, they overpaid for their Condé Nast subscriptions.

71.     Condé Nast's disclosure of Fox's Personal Reading Information to third parties has also caused an influx of third-party print advertisements and marketing calls to her cellular phone, causing emotional distress in the form of irritation, aggravation, anxiety, and fear that her information will be obtained and misused by thieves and scammers, as well as damages in the form of decreased available cellular phone minutes.

72.     Further, Fox's and the other Class members' Personal Reading Information has monetary value, and Condé Nast's failure to comply with the VRPA deprived Fox and the Class of their statutorily guaranteed right to control the disclosure and use of that data. As such, Condé

Nast has diluted the value of Fox's and the other Class members' personal property and deprived them of the opportunity to sell their personal property at market rates for their own financial gain. Accordingly, Fox and the other Class members have sustained, and continue to sustain, monetary injuries as a direct and proximate result of Condé Nast's violations of the VRPA.

73.     As a result of Condé Nast's unlawful and continued disclosure of their Personal Reading Information, Fox and the other Class members have suffered privacy and economic injuries. On behalf of herself and the Class, Fox seeks: (1) an injunction requiring Defendant Condé Nast to obtain consent from Michigan subscribers prior to the disclosure of their Personal Reading Information as required by the VRPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

74.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

75.     Condé Nast offered to sell magazine subscriptions to Fox and the other Class members for specific prices.

76.     Fox and the other Class members accepted Condé Nast's offers by agreeing to pay the offered prices as consideration for purchasing the magazine subscriptions.

77.     Accordingly, Condé Nast, on the one hand, and Fox and the other Class members, on the other, entered into binding contracts for magazine subscriptions.

78.     Because the laws existing at the time and place of the making of a contract are incorporated into it, the contracts between Condé Nast and Fox and the other Class members included obligations for the parties to abide by all applicable laws, including the VRPA.

17

79.     Fox and the other Class members performed their obligations under the contracts by paying the consideration owed to Condé Nast for the purchase of the magazine subscriptions, and by complying with all applicable laws.

80.     The ability to control disclosure of sensitive personal information—such as Personal Reading Information—is material to any consumer transaction because it is likely to affect a consumer's decision to, or conduct regarding, purchase of a product or service.

81.     Condé Nast's failure to perform its contractual obligations imposed by the VRPA—*i.e.*, maintaining confidentiality of subscribers' Personal Reading Information—constitutes a material breach by Condé Nast of the contracts with Fox and the other Class members.

82.     Fox and the other Class members have suffered actual damages as a result of Condé Nast's breach in the form of the value Fox and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

83.     Further, a portion of the purchase price of each Condé Nast magazine subscription sold to Fox and the other Class members was intended to ensure the confidentiality of Fox's and the other Class members' Personal Reading Information, as required by the VRPA. Because Fox and the other Class members were denied services that they paid for and were entitled to receive—*i.e.*, confidentiality of their Personal Reading Information—they incurred actual monetary damages.

84.     Additionally, because Condé Nast profited from its breach, Fox and the other Class members are entitled to disgorgement of all profits obtained by Condé Nast from its unlawful disclosure of its subscribers' Personal Reading Information.

85.     Accordingly, Fox and the other Class members seek an order declaring that Condé Nast's conduct constitutes a breach of contract and awarding Fox and the Class disgorgement of Condé Nast's unlawfully obtained profits and damages in an amount to be calculated at trial.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**
**(In the Alternative to Breach of Contract)**

86.     Plaintiff incorporates the allegations contained in paragraphs 1 through 73 as if fully set forth herein.

87.     Fox's claim for unjust enrichment is brought in the alternative to her claim for breach of contract.

88.     Fox and the Class members conferred a benefit on Condé Nast by providing Condé Nast with their Personal Reading Information and paying Condé Nast for their magazine subscriptions. Condé Nast received and retained the information and money belonging to Fox and the Class when Fox and the Class subscribed to Condé Nast publications.

89.     Condé Nast appreciates or has knowledge of such benefits.

90.     Under the VRPA, Fox and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

91.     Under principles of equity and good conscience, because Condé Nast failed to comply with the VRPA, Condé Nast should not be allowed to retain the full amount of money Fox and the Class paid for their subscriptions or the money it received by selling Fox's and the Class's Personal Reading Information.

92.     Fox and the other Class members have suffered actual damages as a result of Condé Nast's unlawful conduct in the form of the value Fox and the other Class members paid

for and ascribed to the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

93.     Further, a portion of the purchase price of each Condé Nast magazine subscription sold to Fox and the other Class members was intended to ensure the confidentiality of Fox's and the other Class members' Personal Reading Information, as required by the VRPA. Because Fox and the other Class members were denied services that they paid for and were entitled to receive—*i.e.*, confidentiality of their Personal Reading Information—they incurred actual damages.

94.     To prevent inequity, Condé Nast should return to Fox and the Class the value they ascribe to the confidentiality of their Personal Reading Information and all money derived from Condé Nast's sale and disclosure of Fox's and the Class's Personal Reading Information.

95.     Accordingly, Fox and the Class seek an order declaring that Condé Nast's conduct constitutes unjust enrichment, and awarding Fox and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Condé Nast through its sale and disclosure of Fox's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Susan Fox, on behalf of herself and the Class, pray that the Court enter judgment in her favor and against Condé Nast and for the following relief:

(1)     Certify the Class as defined above, appoint Plaintiff as Class Representative, and designate her counsel as Class Counsel;

(2)     Declare that Condé Nast's conduct as described herein violates the Video Rental Privacy Act, M.C.L. § 445.1712;

(3)     Declare that Condé Nast's conduct as described herein constitutes a breach of contract, or, in the alternative, unjust enrichment;

(4)     Award actual damages, including disgorgement, or $5,000, whichever is

greater, to each Class member, as provided by the Video Rental Privacy Act, M.C.L. § 445.1715(a);

(5)     Award injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Condé Nast to cease the unlawful disclosures discussed herein;

(6)     Award reasonable attorneys' fees, interest and costs, M.C.L. § 445.1715(b); and

(7)     Such other and further relief as the Court deems equitable and just.

### DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: September 27, 2012                              Respectfully submitted,

                                                      **Susan Fox**, individually and on behalf of all others similarly situated

                                                      By:/s/  Ari J. Scharg
                                                              One of her attorneys

Ari J. Scharg
EDELSON MCGUIRE, LLC
350 N. LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
ascharg@edelson.com

Christine E. Ficks
BODMAN PLC
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
Tel: (313) 393-7561
cficks@bodmanlaw.com

*Counsel for Plaintiff Susan Fox*